Good morning, Your Honors. May it please the Court, Wayne Clayton on behalf of Appellant Leslie Smith. The key to the proper determination of this appeal is in the examination and analysis of the actual evidence submitted below, as opposed to counsel's broad-brush descriptions of that evidence. When the actual evidence is viewed and analyzed, it's plain that genuine disputed facts exist as to Appellant Leslie Smith was performing satisfactorily or better at the time that she went down on pregnancy leave in March 2002, and also that the stated reason for her termination, the non-renewal of a contract, was pretext to hide a discriminatory and or retaliatory intent. Plaintiffs submitted substantial evidence below of her satisfactory job performance. She showed that she had increased her sales as evidenced by increase in sales commissions. She improved her sales by 33% as evidenced by these commissions, and that's among defendants' own documents at our excerpts at page 590. Ms. Smith's immediate supervisor advised human resources just shortly before her termination, but she was a great asset to the Southern California team. In January of 2002, she had the highest number of orders in the Southern California region. All of this was submitted below. What happened to those orders? They did not get filled, Your Honor. At the time of her non-renewal, was it known that those orders were not filled? I believe that's true, Your Honor. So she got the orders, but for whatever set of reasons, and I Yes, Your Honor, but her supervisor, Nationalist, did testify, and it's part of the record below, that it was not any fault of hers that the actual order did not get filled. With respect to the documents submitted by defendants below, on which they rely heavily, and try to characterize her sales as among the worst in the country, we objected below. The court overruled, en masse, all of our evidentiary objections. We contend that that was an abuse of discretion. Why aren't those business records? I'm assuming what you're after is trying to get out, or at least not have to be considered for the truth of the matter, the record that shows all the different account managers and the percentage of quotas and sort of lining them up across the country. That's what you want to keep out, or at least limit, right? Correct, Your Honor. Why aren't those business records? Well, first, they're summaries, and Well, that doesn't meet Judge Fletcher's question. That's a different subject. That's 1106. Why aren't they 803 business records? There was not sufficient. The only foundation laid by Ms. McKinney was that they were prepared at her direction. There was no evidence of when they were prepared, no evidence that they were prepared. I thought there was evidence that they were prepared every couple of weeks. Pardon me? Wasn't there evidence they were prepared every couple of weeks? My recollection of Ms. McKinney's declaration is that they were prepared at her direction without specification as to the timing. All right. The other issue that I was raising was with respect to the summary in nature. No, hold it. Your attack on the foundation solely on the basis that there is no evidence in which a reasonable trier of fact could find the records were prepared. You're giving, you're not objecting to the fact that they were used in the normal course of business, that they were prepared from sources that would be trustworthy, that they were kept in the business of the company. Those you're not attacking, correct? No, I'm not correct, Your Honor. With respect to the trustworthiness, we do not have sufficient foundation. Ms. McKinney, again, her declaration is extremely broad and states that they were prepared at her direction. It does not provide, state how the data was gathered. It does not say who gathered the data. We don't know the source of this information. And coupled with this, we have Ms. Smith submitting in her declaration that she was not shown this information at the time and testifying that the information is inaccurate. So that puts whether that's a conflict in a conflict in the foundational testimony. But just so I've got you straight, your claim is that there's a lack of foundational testimony by half David or declaration as to when. From what sources and who gathered the information, correct? Correct. Thank you. And then that's it. That's the sum total of your objections to this material as far as being a business record. Well, and more generally, that Ms. McKinney does not have personal knowledge of the facts necessary to lay that foundation. The custodian, the custodian who testified to these records, did not have personal knowledge of the entries made in the books of the business of the idea. Well, not just of the actual numbers, but of the gathering of the information, what the sources were. And we don't know who she, whom Ms. McKinney directed to prepare the documents. She just testified that they were prepared at her direction. But we have no information as to the trustworthiness of the information contained in the documents. And then with respect to an admissible summary, the documents do not meet the Paddock versus Dave Christiansen criteria because we were not provided the underlying materials upon which the summary was based. And certainly did not submit those materials to the court below. Going back to Ms. Smith's substantial evidence regarding her satisfactory job performance with respect to the prima facie case of both pregnancy discrimination and retaliation. Ms. Smith's declaration is that the accurate documents reflecting her performance were the increased commissions and that those documents reflected that her commissions were among the highest of any of the account managers in the region. Now, where are the documents upon which you rely, not that these are her commissions, but your statement that they're among the highest of any account manager in the region? Where do you get that comparative evidence? Our basis for that is from Ms. Smith's declaration at page 433. And does she provide, what does she say there, except that, could you read that? I didn't bring it downstairs, I read it yesterday, but as I recollect, she doesn't give numbers for anybody else. She says, I did review weekly commission reports, which defendant does not attach, which reflected in my commissions were among the highest of account managers, period. And do we have any documentary evidence besides that affidavit or declaration that give us sort of some foundation for that comparative statement? We do not have those documents which she refers to in her declaration. I see. And you don't have, maybe this is outside the record and a difficult question for you to answer, you don't have them because you never asked for them? I mean, why don't we have these things? We did ask document requests expansive enough to have those produced. I do not remember offhand the particular reason that they weren't produced. Okay. And Ms. Smith did not have copies of them. Okay. With respect to the second primary issue, the issue of pretext on both the pregnancy discrimination and retaliation, Ms. Smith, I'm sorry, let me backtrack a minute on the substantial evidence of satisfactory performance. Even looking at Appellee's evidence below, they submit several documents that state the reasons for terminations of account managers. On these documents, they have several different reasons. One of those reasons is unsatisfactory performance. That is not mentioned with respect to Ms. Smith. If that unsatisfactory performance was the reason for her termination, it would have so stated. Are you sure that that's right? I mean, we see terminations every day in which personal reasons are the given reason by both sides because unsatisfactory performance would not be a particularly nice thing to have reported in the press. And it may well be that in those circumstances, I'm not yet speaking of Ms. Smith's, that unsatisfactory performance is why. But every day, you know, Chief Executive so-and-so resigns for family reasons. He wants to spend more time with his family. Absolutely, Your Honor. But this is an internal document, and there are many employees on this document. I mean, this is a comparative document with comparative information, and there are many employees on there where unsatisfactory performance is listed. Yes, I know. There's employees who are pressured to resign for performance reasons is listed. So they were not circumspect in putting impolitic reasons on there. They were stating the reasons that were given to the employee or their best information. Okay, fair answer. Yeah, okay. And what I was about to say is even though this is not dispositive, it does raise a tribal issue of fact for a jury to determine. I mean, it may be that when the jury looks at all the evidence from both sides, perhaps they will believe Park's view. But it is for the jury is the one to weigh that evidence, not the district court on summary judgment. We believe that the failing of the summary judgment here is similar as to in Chuang, where just the evidence was not properly regarded by the district court to give every incitement to the opposing party's evidence and instead weighed in favor of the moving party's evidence. With respect to pretext, Smith provided substantial evidence on that issue as well. Timing is critical here. In Stiegel and in Bell, this court held that timing is a critical issue in terms of looking at pretext. Smith was fired two days after she faxed to Human Resources a note from her doctor that she needed increased time off for her pregnancy leave. And how much time did she need in this note? The doctor did not give an absolute time. He said that it was as much as possible, but at a minimum 12 weeks. 12 weeks from the date of birth? I remember the 12 weeks. I'm trying to remember. My reading of the note is 12 weeks from the date of the note. And how long after the birth was that note? Approximately a month, slightly more. And how much is the ordinary sort of postnatal leave that the company allowed? Ordinary was 12 weeks. So if it was 12 weeks from the date on the note and that note was sent four weeks after the birth, the minimum requested is four extra weeks. Yes, Your Honor. And the company clearly, if they thought the 12 weeks was excessive, they could have discussed that and there could have been. Now, under company policy, was she paid during this postnatal period? No, Your Honor. It was non-paid leave. And we don't claim that that's discriminatory. All right. Okay. Another key fact on the pretext is the absence of a decision-maker. Ms. McKinney kind of in broad strokes. You mean the absence of an admitted decision-maker. Well, it was an identified decision-maker. It was not the immediate supervisor, Mr. Balin, he testified that he was not the decision-maker. It was not the president, Minor Smith. He said, quote, I didn't make the decision to select Leslie Smith for termination, no. And Ms. McKinney tries in her declaration to kind of hedge it, but in deposition she was quite clear. Question, what was your role in Ms. Smith's termination? Answer, mine would have been a consultative role, and basically to process the termination and to make certain that Leslie was treated fairly, close quote. We don't have an identified admitted decision-maker, which brings into question the admissibility of all the documents that they said they relied on in terminating her, because we don't know whose decision or whose mind to try to get into. So that is a very key element of pretext. I note that my time is almost up, so I'll save the last two minutes. Okay. Thank you. May it please the Court, George Priones on behalf of Alternative Resources Corporation. I, too, agree that the key is to look at the actual evidence, and I do want to turn initially to the question of authentication. The declaration of Sharon McKinney, which was referred to at paragraph 14 on page 101 of the transcript, says, Exhibit 28 is an example of the objective sales performance reports, that's plural, that Minor Smith and I kept updated and relied upon throughout our reviews of the sales force and regular meetings with the sales vice presidents. We used these reports to track specific performance criteria, to follow trends in the sales of individual account managers, to rank all of the account managers' performance, and to create specific action plans for underperforming account managers. These exhibits, particularly Exhibit 28, is exactly the business record that was relied upon by the ARC management when it evaluated and made these decisions. Where does she say what she used to tabulate the figures? Pardon? Where does she say what she used to tabulate the figures? She didn't say that she tabulated the figures. She was deposed. She was deposed and questioned about Exhibit 28, and in her deposition also testified essentially to the same thing. The underlying business records, many of them are included in the excerpts of the record. These were all the, in the course of discovery, all the sales records throughout the nation were provided to the plaintiffs. I suppose I didn't phrase my question as precisely as I could have. Where does Ms. McKinney state what she used to transpose onto Exhibit 28? Did she use the New York Times? Did she use sales records of the company? What did she use? Well, if you look at Exhibit 13, for example, it says attached in Exhibit, Paragraph 13, is a true and correct copy of a report prepared at my direction of sales results through May 3, 2002. She says in her declaration, and she said in her deposition, that they were looking at the actual sales numbers that are generated as a routine business record by the company. Where did she say that? Other than what you've just told me, a report prepared at my direction. It doesn't say from what. Of sales results through May. Of sales results. Right. That exhibit is also very important in a couple of respects to address what plaintiff was urging as the evidence that establishes her prima facie case. What we see at Exhibit 28 is that they are evaluating five or six different categories of information. There's a column for the 2001 ranking, which is where you rank number one, two, or three in the prior year. That counts for 5%. There's a column for the revenue of the current year. That counts for 25%. The column for the gross margin for the current year, that's 40%. There is a column for weekly starts, and that counts for 10% for weekly job requisitions, and then another column, 10%, for the weekly starts. So the company did make a distinction between did you get the order and did the order get filled. They got some credit for getting the order in. If it got filled, then they got more credit. By the way, the issue of filling the orders, if I ask, I want to get a 300 hitter who's going to hit 25 home runs, but I only want to pay $500,000, that's going to be a tough order to fill. Depending, some orders are easier to fill than others when you're looking for specific technology employees, and that's why some orders don't get filled. Then, again, another 10% for solutions revenue. So they had certain identified criteria on which they rated everybody and ranked them, and there's a percentage number, et cetera. What plaintiff is suggesting is that we disregard the exact information the company relied upon and instead use information that they didn't rely upon, that, for example, her increase in sales. As the court already recognizes, there is no comparative information. Her sales volume may have gone up, her commissions may have gone up, but everyone else's commissions may have gone up even more. So the idea that it went up a certain percentage from year to year is not particularly remarkable since they changed the system, number one, and since they were reducing the overall size of the sales force and attempting to push a situation where the average salesperson was selling only $2 million worth of services to one where the average salesperson was selling $4 million, and it went from 144 down to 45 salespeople. Exhibit 63 is also important because in evaluating what criteria were used and how the decision was made, you can't do it in a vacuum, and Exhibit 63, which is the financial records of the company, show that in a space of four years, they lost $70 million. Their sales dropped almost in half, and their net worth went from $70 million to $5 million. You know, there's a famous NLRB case that I remember from law school, the name of which I can't remember, but the facts are quite striking, and it was given as a lesson for a particular principle. There was a perfectly dreadful employee who was tolerated by management for years. He then joined the union and was immediately fired. And that was an example of, well, he might have been a perfectly dreadful employee, but given that he was immediately fired only after he joined the union, it appears that they fired him for an impermissible reason. Now, what do you do with the evidence here that shows that she was only terminated or her contract only renewed after she became pregnant, after she was told by her supervisor, don't call HR, you've opened up a can of worms down there, and then two days after she requests additional time because of the complications of the birth? That is to say, that takes into consideration, then, that she might not have been the ideal employee or that she might have been even a perfectly dreadful employee. I don't characterize that. There's several responses to that. First of all, before she became pregnant in January of 2001, she was put on probation and a performance improvement plan because her performance was unsatisfactory. Her supervisor at that time was a woman by the name of Sidney Runyons. Ms. Runyons left the company at a time when the performance improvement plan had not worked its course. And between June of 2001 and October of 2001, there was a vacancy in that direct supervisory position. As a result, the performance plan expired, Ms. Smith's annual contract automatically renewed, and by the time a new supervisor came in, Mark Nackless, it was October 2001. At that time, Ms. Smith was already pregnant. So the idea that she was not criticized and, quote, tolerated prior to her pregnancy is incorrect, I think. But certainly she was not terminated during that period. Correct. That's not. But it's also undisputed that in 2001, after Minor Smith became president in July of 2001, there was an organized effort to create these documents such as Exhibit 28 and to rank everyone and to weed out the underperformers so that they could reduce the overall size. What struck me about the evidence that, in fact, Ms. Smith doesn't want to have come in, but it's the comparative evidence of all the people who have been terminated for various reasons, unsatisfactory performance, resignation, sort of encouraged resignation, and so on, the great bulk of those took place in 2000 and 2001. Many did. I would say the great bulk of them took place in 2000 and 2001, not just many, but most. I would say that a great many of them, most of them took, I will concede that most of them took place before the end of 2001. That's right. And her termination or failure doesn't take place until 2002. So that raises an inference, at least, that something else is going on when she's being terminated because all the other, or not all, many of the other, most of the others that were terminated because of the business downturn and, in that context, unsatisfactory performance, had already been terminated. Why wasn't she terminated then? Well, the straightforward answer is the answer that was given by Ms. McKinney and Mr. Smith, both of which stand unrebutted and are uncontroverted evidence, and that is simply that they realized that they earmarked her in August of 2001 for termination as one of the underperformers, but they realized that she had an annual contract that had 10 months more to run. But they could have terminated her for an unsatisfactory performance under that contract, couldn't they? They, in their minds, that was a commitment to pay them for another 12 months. No, I'm asking you a different question. Could they legally have terminated her during that contractual period for unsatisfactory performance? That is unclear. There's nothing in that contract that allowed termination for unsatisfactory performance. Absolutely, there's language to that effect. But what Ms. McKinney's testimony was is she did not think so, because in their view the annual contracts were considered in that term. Then why do we have termination for unsatisfactory performance for all those others instead of simply saying, fairly to root for a new contract? Because not all the others had these annual contracts. And how much evidence do you have in the record as to the nature of that? If you look, again, at Exhibit 28, for example, there is a list under the action plan. It identifies which of the account managers do have employment agreements. For example, Shelly Siteman, who is one of the people in the same Los Angeles region, has an employment agreement 925, etc. Many of them do not have employment agreements. Some of them do. So there is an identification. In fact, as Exhibit 28 shows, they were tracking those end dates of the employment agreements. But getting back to the timing question, there's an important point to keep in mind on the timing question. And that is, although Mr. Clayton argued that she was terminated shortly after a doctor's note was received, which is true, this was 10 months after she said she was pregnant. And, you know, the pregnancy thing is an interesting situation on timing. I mean, had she been terminated in October of 2001, even if others had been terminated at the same time, she would argue, well, I just told you I was pregnant. And had the company waited until July, said she was going to return in the middle of July, and said, okay, you're back, it's July 5th or July 15th, and August 1, they say you're now terminated. Yeah, I understand that pattern of evidence. After she becomes pregnant, it turns out that she has a somewhat problematic pregnancy. And there's an attempt by the company, which I fully understand, they're trying to drive up the sales because the company's having trouble. And they're saying, you know, we're putting your quote up from roughly $2 million to roughly $4 million. She says, with the doctor's evidence, you know, this may turn out to be a Down syndrome child. This last trimester of pregnancy is going to be very difficult. This is a bad time for me to be doing this. They give her the option of, well, you can reduce your time less than 40 hours. She says, no, I'd prefer to keep it at 40 hours. She contacts human resources. She's told by her supervisor. I think by that time it's Mr. Nicholas. You've opened up a can of worms. Why are you calling them? Then when she asks for an additional four weeks, if that's quite how to characterize it, she's finally terminated. After she had been given in some of these earlier reports very clear instructions as to how she was going to be given a chance to improve, that chance to improve is never actually given to her, even though in some of those earlier reports it was, well, when you come back from the delivery of the child, then we can work to, you know, we'll help you close it or, you know, the various things that are set. Why is that not enough to go to the jury? Because the timing of it, as I said, was dictated by the end date of her. Well, that's what you say. Correct. And that's what is uncontroverted. Well, no, it is controverted. The timing, that is to say when the contract comes to the end, would have come to the end, is uncontroverted, but the motivation is controverted. And the, no, the motivation is what the company states as the reason for. Well, of course that's what the company said, but you can't say that's uncontroverted because obviously she says the motivation is different. Well, if that were the standard, I think you would never have a summary judgment. Well, I understand that, but the reason, what I'm reacting to is your statement that this is uncontroverted. Okay. It is controverted. There may be insufficient evidence to survive summary judgment. All right. In terms of the timing, though, again, if you look at Exhibit 28, it does show that many other people were terminated in 2002 and were. . . How many? Well, we could start with Brenda Smith. Then there's Leslie Smith termination pending. You were talking about others. Brenda Prather termination pending. Okay. We're talking 2002 terminations. Correct. How many? Brenda Smith? Brenda Smith, Brett Prather. Then there's Robert Shelton termination pending, Lynn Fortenberry termination pending, James Clark termination pending. Pending or accomplished? David Jordan termination pending. All of these. . . What's the word pending mean? That means that they were earmarked for termination unless their things improved. And then with the two people that Plenius noted in their brief, Mr. Willen and Mr. Watts, they were both terminated. And Mr. Watts in Boise was terminated shortly after. . . He was terminated in December. And, again, if you look at the company's analysis, it says termination pending DEQ deal. The DEQ deal fell through. He was terminated. And the same was true with Mr. Willen in Detroit. He was terminated. So there were some people in 2002 that were terminated in advance of Ms. Leslie Smith, like Brenda Smith. There were some that were terminated after. I see that I'm about out of time here. I don't. . . Before you sit down, there are a couple of things that the counsel, Mr. Clayton, mentioned as substantial evidence that creates a tribal issue of fact. One of them is that the documents we referred to as the reasons for termination as unsatisfactory performance as other persons, but not as to Smith. Isn't that . . . doesn't that create a basis upon which a reasonable person can say, well, if they had a custom and practice of saying unsatisfactory performance as to other people, and didn't say it as to Leslie Smith, that wasn't a reason. Well, as I think I explained, there were many people who . . . many of the account managers who did not have these annual contracts. Only certain account managers did. It was an historical . . . The basis is that she had an annual contract. One other . . . you've answered that. One other issue. At ER 590, Mr. Clayton points out that the immediate supervisor, just before she was hired, said about Leslie Smith, she's a great asset. Doesn't that create an issue of fact as to whether she's doing her job well? That was Mr. Naklas, who was no longer her supervisor at the time of the termination and who had no role in the termination. What he did say in January was at a time of, again, annual renewal of objectives, et cetera, in January of 2002. That was an email that was sent and copied to Ms. Smith. And like all good sales managers that are coaching their people, they say she's got some ability, she's an asset, let's hope she does better. I mean, that's the context in which that was sent. And, you know, there's a fine line between telling people, you know, I know you can do it, but you've got to get your sales up to saying that, hey, you know, you're a total flop and I'm about to fire you if you don't get your sales up. You know, there's a . . . managers don't do . . . I hope don't do the latter. My last question. Do you give any significance to what Mr. Clayton apparently does, that there was a lack of an admitted decision maker as to her termination on the pretext issue? Decisions are made by, as was clear, I think, from the depositions of everybody and from the . . . They were made in a collaborative context, that the process that was followed is that there were meetings and telephone calls between Miners, with Miner Smith, Sharon McKinney, and each of the various regional managers to discuss their stats, the strong points, the weak points, et cetera. But doesn't the buck stop somewhere? What Miner Smith said is that he participated in the decision, as did Sharon McKinney, as did Balin. Balin said, I was told it's time to let her go. There's no question that that's what he said. And from his point of view, that order came from above. That's correct. From Mr. Miner Smith's point of view, Mr. Balin was the one who picked her as the weakest performer. And I don't think those are inconsistent. But so far, nobody's fired her. Meaning, I have not yet heard you tell me who fired her, who made the decision to do it. I'm asking for an individual, or if you want, you can give me three individuals. I think it's clear that it was Miner Smith and Sharon McKinney, who... Both of whom denied having done it. Who, along with Balin, made the decision, and Balin is the one who sent the letter and implemented it, yes. Yes, what? They were all three involved. Even though none of them really wants to say, I did it. They all kind of say, eh. You know, what we remember from a collaborative decision like that can be different. That's right. Everybody claims success, and nobody claims firing. Okay. The last thing that I want to mention is what happened in the Southern California region. Okay. You're over time, but let's hear what you have to say. I'm sorry. That's all right. There were four sales account managers in Southern California. All four were female. All four had recently had pregnancy leaves of absence. Three of them, Ms. Zeitman, Ms. Freitas, and Ms. Applin, were all performing at far superior results than Ms. Smith. After Ms. Smith was terminated, there were these three remaining managers. There was no replacement of her, and to this day, there hasn't been a replacement, certainly as of the time of the summary judge's motion. Okay. Thank you. Thank you. Very briefly, with respect to Mr. Prionis' last point about other pregnant employees in Southern California, as the court is aware, this court in Schwann reiterated that the test is a motivating factor. There's no evidence on the record here that any of these other employees complained that they were being singled out for the pregnancy. So we have here the dual issues of retaliation and pregnancy. And we also objected below that it was indomitable character evidence with respect to the other employees. But the primary fact there is there's no record evidence that any of the other employees complained about being discriminated against because they were pregnant. Well, the others weren't fired. Correct, but Ms. Smith had talked about being singled out before she was terminated. I mean, that's the source of the retaliation claim. With respect to the court's point about the employment agreement having an express language for termination for unsatisfactory performance, it is certainly there. And with respect to Exhibit 28, which is at page 287 of the excerpts, Mr. Watts had an agreement, and there the stated reason for his termination is termination plan and the deal pending. It is not termination because of non-renewal of the contract. They did not wait, in his instance, for anything with respect to the timing of the contract. This was just a convenient excuse to try to hide what the true motivating factors were. Thank you very much, Your Honors. Okay, thank you. Thank you both for a helpful argument. The case of Smith v. Alternative Resources Corporation is now submitted for decision. We'll take 10 minutes, and then we'll return. We're in adjournment for only 10 minutes. All rise.
judges: T.G. Nelson, W. Fletcher, Bea